

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED
**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2017**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: § | |
| § | CASE NO. 16-34424-BJH |
| **WOODHAVEN TOWNHOUSE** § | (Chapter 11) |
| **ASSOCIATION, INC.,** § | |
| § | Related to ECF Nos. 40 & 41 |
| DEBTOR. § | |

## MEMORANDUM OPINION

Before the Court is the Debtor's Amended Objection to Claim of Christina Dudek (Claim No. 3) [ECF No. 40] and the Debtor's Amended Objection to Claim of Nacol Law Firm (Claim No. 4) [ECF No. 41][1] (together, the "**Claim Objections**"). The debtor is Woodhaven Townhouse Association, Inc., which, as its name implies, is a townhome association located in Richardson,

---

[1] At a hearing held on March 24, Mark Nacol ("**Nacol**"), the principal shareholder of the Nacol Law Firm, agreed that (i) the Nacol Firm Claim duplicated the Dudek Claim, (ii) the right to recover attorneys' fees and expenses belonged to Dudek, and (iii) the Nacol Firm Claim would be withdrawn since the Dudek Claim included the request for attorneys' fees and expenses. Accordingly, the Court need not consider further the Association's objection to the Nacol Firm Claim, as it is subsumed into the objection to the Dudek Claim.

MEMORANDUM OPINION                                                                                                                  1

Texas (the "**Debtor**" or the "**Association**").  The Court heard the Claim Objections on March 7, 2017 and, after reopening the evidence, concluded the hearing on March 27, 2017.  This Memorandum Opinion contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.[2]

I.         FACTUAL AND PROCEDURAL BACKGROUND

Christina Dudek ("**Dudek**") caused Proof of Claim No. 3 to be filed on December 13, 2016 by her counsel, through which she asserts a claim of $69,139.35 against the Association (the "**Dudek Claim**").  Attached to the Dudek Claim is a state court petition through which she sought to obtain a judgment against the Association for (i) its alleged breach of contract – *i.e.*, the written Bylaws of the Woodhaven Townhouse Association, Inc. [Association Ex. 8] (the "**Bylaws**") and other related documents, (ii) its alleged negligence and gross negligence, (iii) its alleged breach of fiduciary duty owed to Dudek, and (iv) the attorney's fees she incurred in bringing the breach of contract claim in her state court lawsuit.  Because the state court lawsuit was pending and had not proceeded to trial when the Association filed its bankruptcy petition, Dudek's Claim was unliquidated as of the petition date.

The factual predicate for the Dudek Claim revolves around foundation problems Dudek experienced at her townhome and her desire to have the Association make and pay for the necessary repairs.  In oversimplified terms, Dudek contends that under the terms of the Bylaws and related documents, the Association is responsible to repair the foundation of her townhome.  Attached to the Dudek Claim as Exhibit C is an itemization of her alleged actual damages plus

---

[2] Any finding of fact more properly considered a conclusion of law, or any conclusion of law more properly considered a finding of fact, should be so considered.

attorney's fees, costs of suit, and future repairs she apparently asserts will be necessary to the interior of her townhome, all of which total the $69,139.35 sought in the Dudek Claim.[3]

The Nacol Law Firm, PC, Dudek's counsel in the state court lawsuit and here, filed Proof of Claim No. 4 on December 13, 2016 on its own behalf, asserting a $22,602.35 claim against the Association (the "**Nacol Firm Claim**").  The state court petition that was attached to the Dudek Claim was also attached to the Nacol Firm Claim, which seeks to recover the attorney's fees and expenses the firm expended on Dudek's behalf in the state court lawsuit.  However, a careful review of the Nacol Firm Claim confirms that it duplicates the Dudek Claim with respect to the requested fees and expenses.

As noted previously, the Claim Objections were set for hearing before the Court on March 7, 2017 (the "**Hearing**").  The Association, having filed a witness and exhibit list in accordance with the Local Rules for the Northern District of Texas, was permitted to offer evidence in support of the Claim Objections at the Hearing.  However, neither Dudek nor the Nacol Law Firm filed a witness and/or exhibit list.  Because of this, the Association objected to the introduction of any evidence by Dudek and/or the Nacol Law Firm at the Hearing, alleging unfair surprise and prejudice.  The Court sustained the Association's objection, and neither creditor was permitted to offer evidence at the Hearing.[4]

However, on March 23, 2017, the Court advised the parties by email from its Courtroom Deputy that (i) it had reconsidered its ruling sustaining the Association's evidentiary objection and that it wished to hear a proffer of the testimony that Nacol had sought to give at the Hearing, and

---

[3] Also included in the $69,139.35 amount are damages allegedly resulting from a break-in to Dudek's townhome because the locks to her doors would not engage due to the foundation issues.  These non-repair damages include property not replaced after the break-in ($1,000), the costs of a locksmith ($337), installation and monthly fees for an alarm system ($2,750), and Lifelock fees since 2012 ($1,200).

[4] Dudek did not attend the Hearing.  The only witness that Dudek's counsel, the Nacol Law Firm, sought to have testify was Nacol, the principal lawyer at the firm representing Dudek here and in the state court action.

MEMORANDUM OPINION                                                                                              3

(ii) once the proposed testimony was proffered, the Court would give the Association the opportunity to explain how it would be unfairly surprised and/or prejudiced by the admission of that proposed testimony.  Nacol proffered his testimony on March 24, 2017, at a hearing already scheduled to consider, among other things, confirmation of the Association's proposed plan of reorganization.  As the Court suspected, Nacol's testimony only related to the reasonableness of the fees that the Nacol Law Firm had incurred in representing Dudek.  Because copies of the Nacol Law Firm's fee statement were attached to both the Dudek Claim and the Nacol Firm Claim, the Court concluded that there was no unfair surprise or prejudice to the Association and scheduled a further evidentiary hearing for March 27, 2017.

At this later hearing, the Court reopened the evidentiary record to permit Nacol to testify consistent with his proffer and for the Association to offer rebuttal evidence, if any.  At the hearing, Nacol offered testimony in support of the reasonableness of the fees and expenses the Nacol Law Firm incurred in its representation of Dudek (both before and after the Association's bankruptcy filing) and was subject to cross-examination.  In turn, the Association offered rebuttal testimony regarding the reasonableness of the Nacol Law Firm's fees and expenses from: (i) its state court counsel, Jason Reed, with respect to the claimed prepetition fees and expenses of the Nacol Law Firm, and (ii) its bankruptcy counsel, Joyce Lindauer, with respect to the claimed post-petition fees and expenses of the Nacol Law Firm.  The Court then re-closed the evidentiary record and heard further oral argument on the Claim Objections.  The Court also permitted the parties to submit limited post-hearing briefs.  Nacol filed the last brief on March 30, 2017, at which time the Court took the matter under advisement.

## II.  LEGAL ANALYSIS

With this background in mind, the Court will turn to its analysis of the Association's objection to the Dudek Claim. For the reasons explained below, the Court sustains the objection and disallows the Dudek Claim in its entirety.

In bankruptcy, a proof of claim filed in accordance with Bankruptcy Rule 3001 is "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f); *see California State Board of Equalization v. Official Unsecured Creditors' Committee (In re Fidelity Holding Co., Ltd.)*, 837 F.2d 696, 698 (5th Cir. 1988). However, the objecting party may rebut this prima facie validity by producing evidence "of a probative force equal to that of the creditor's proof of claim." *Fidelity Holding Co., Ltd.*, 837 F.2d at 698; *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985); *see Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059 (5th Cir. 1998). In other words, and as this Court recently held, once the prima facie validity of a proof of claim under Bankruptcy Rule 3001(f) is established,

> [t]he burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question.

*In re Wyly*, 552 B.R. 338, 379 (Bankr. N.D. Tex. 2016) (citations omitted).

Thus, once an objecting party produces evidence rebutting a proof of claim, the burden then lies with whichever party would normally bear such burden under relevant substantive law. *Id.* at 378. Here, that relevant substantive law is Texas state law, which puts the burden of proof on Dudek to establish her breach of contract, negligence, gross negligence, and/or breach of fiduciary duty claims against the Association, along with her entitlement to a recovery of reasonable

attorney's fees and expenses on her breach of contract claim. *See, e.g., Montoya v. Las Palmas Med. Center,* 2015 WL 12551109, at *9 (W.D. Tex. August 6, 2015) (plaintiff bears the ultimate burden of proof on its negligence claims); *Travelocity.com v. CGU Ins. Co.*, 2003 WL 21501779, at * 3 (N.D. Tex. June 25, 2003) (plaintiff carries the ultimate burden of proof on breach of contract claims); *Edwards v. Pena*, 38 S.W.3d 191, 198 (Tex. App.—Corpus Christi 2001, no pet.) (plaintiff bears ultimate burden of proof on breach of fiduciary duty claim); TEX. CIV. PRAC. & REM. Code § 38.001 (Procedure for Recovery of Attorney's Fees).

With this understanding of the shifting burdens, the Court returns to its analysis. As previously explained, a proof of claim executed and filed in accordance with Bankruptcy Rule 3001 constitutes "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f). As applicable here, the general requirements under Bankruptcy Rule 3001 are that the proof of claim conform substantially with the appropriate Official Form, is executed by the creditor or the creditor's authorized agent, and, if the claim is based on a writing, it attach a copy of that writing. The Dudek claim meets these requirements. It was filed on Official Form 410, which is the official proof of claim form utilized in bankruptcy cases, and was signed by Nacol as Dudek's attorney. Claim No. 3 at 1-3. Moreover, Dudek attached multiple documents to her claim, including among these: (i) Plaintiff's Original Petition filed in the state court action, (ii) the Residential Earnest Money Contract (Resale) under which Dudek purchased her townhome and related documents, (iii) a copy of a prior version of the By-Laws,[5] and (iv) an itemized list of Dudek's alleged damages.

Despite this, the Association argues that the Dudek Claim should not be afforded prima facie validity because (i) it fails to establish the required elements for its claims for breach of contract,

---

[5] It appears that the By-Laws attached to the Dudek Claim is an older version of the document. At the Hearing, it was established that Association Ex. 8 was a copy of the operative By-Laws.

negligence, and gross negligence, (ii) it is internally inconsistent, and (iii) the documents attached to the claim are inadmissible hearsay. Association's Letter Brief [ECF No. 88] at 1-4. Basically, the Association argues that, at the proof-of-claim stage, a claimant must submit evidence that fully supports its claim in a form that would be admissible under relevant evidentiary rules to be afforded prima facie validity. The Association, however, fails to cite the Court to a single case holding a proof of claim to such a high evidentiary standard before affording it prima facie validity. Instead, the Association relies on cases outside the proof-of-claim context to discuss burdens of proof and/or conflates the requirements for prima facie validity under Bankruptcy Rule 3001 with a party's ultimate burden at trial. *Id.* However, "nothing in Rule 3001 or other bankruptcy rules requires a claimant to reduce the evidence submitted with its proof of claim into a form that would be admissible under state law. Indeed, requiring a claimant to produce additional evidence to overcome a hearsay or other evidentiary objection directly undermines Rule 3001." *In re Walston*, 606 Fed. Appx. 543, 547 (11th Cir. 2015) (unpublished); *see also LTV Corp. v. Gulf States Steel, Inc. of Ala.*, 969 F.2d 1050, 1058 (D.C. Cir. 1992) (explaining that "[p]roofs of claim are not intended to be elaborately detailed documents"); *In re Burkett*, 329 B.R. 820, 827 (Bankr. S.D. Ohio 2005) ("[T]he rules governing claims are intended to simplify the claims allowance process and provide a fair and inexpensive process for all parties including creditors.").[6]

Accordingly, based upon its review of the Dudek Claim, the Court concludes that it complies with the requirements of Bankruptcy Rule 3001 and serves as prima facie evidence of the validity and amount of Dudek's claims against the estate. FED. R. BANKR. P. 3001(f).

---

[6] The Association initially also argued that, because Dudek failed to move the Dudek Claim into the record, the Court has no basis upon which to find that the claim is entitled to prima facie validity (despite the fact it is attached as Exhibit 1 to the Dudek Objection). The Association apparently abandoned this argument, however, as it failed to include it in the post-Hearing briefing of open issues requested by the Court.

Because the Dudek Claim is afforded prima facie validity, it is the Association's burden to rebut that validity by "produc[ing] evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."  *Wyly*, 552 B.R. at 375 (citing cases).  In this regard, the Association argues that it has not breached any contract with Dudek because the Bylaws and related documents do not require it to repair Dudek's foundation.  The Association further argues that it (i) did not fail to act as a reasonably prudent homeowner's association, (ii) carried out its duties under the Bylaws and related documents, and (iii) did not purposefully breach its duty to Dudek for which it could be held liable to Dudek for negligence and/or gross negligence.  Finally, the Association argues that it did not breach any fiduciary duty to Dudek, since it has acted in a manner consistent with its duties under the Bylaws and related documents.  And, because it is not liable to Dudek for any breach of contract, it is not liable to pay her reasonable attorney's fees and expenses.  In support of its objection, the Association introduced various exhibits into evidence at the Hearing including the Bylaws [Association Ex. 8] and the Declaration of Covenants, Conditions and Restrictions of the Woodhaven Townhouse Subdivision [Association Ex. 9] (the "**Covenants**"), along with the testimony of: (i) Elena Garrett ("**Garrett**"), the President of the Association's Board of Directors, and (ii) Luis Capote ("**Capote**"), the owner of The Foundation Company.

Before considering this evidence, however, it is helpful for the Court to boil the parties' dispute down to its most basic element.  Simply put, this dispute turns on the proper interpretation of the legal documents governing the parties' relationship—*i.e.*, the Bylaws and the Covenants—and whether they impose a contractual or other duty on the Association to repair Dudek's

foundation.[7] As explained below, however, the Bylaws and Covenants are not particularly clear on this issue, and neither party filed pre-Hearing legal briefs addressing the treatment of this issue under state law. Thus, at the Court's request, both Dudek and the Association submitted post-Hearing briefs; however, neither party found any controlling case law. Nor did the Court through its independent research.

The parties, however, agree that Texas law governs this issue. Thus, Court must interpret the By-Laws and Covenants in accordance with the general principles of contract interpretation articulated by the Texas Supreme Court.[8] *See generally Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983). The Court's first task is to determine whether the contract is enforceable as written, without resort to parol evidence. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The Court's primary objective is to ascertain the parties' intent as expressed in the contract. *Lopez v. Munos, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000) (citation omitted). To achieve this objective, the Court should examine the entire contract in order to "harmonize and give effect to all of its provisions so that none will be rendered meaningless." *J.M. Davidson,* 128 S.W.3d at 229 (citation omitted). In doing so, the Court must be wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). A contract is unambiguous if it can be given a definite or certain legal meaning. *Id.* (citation omitted). Ambiguity does not arise because of a "simple lack of clarity," or because the parties proffer different interpretations of the contract.

---

[7] At the hearing held on March 24, the parties agreed that the Bylaws and the Covenants were the governing documents and that the Court must construe those documents together.

[8] While the parties disagree over the proper interpretation of the Bylaws and Covenants, they generally agree on the principles of contract interpretation in Texas—*i.e.*, that (i) "[t]he contract must be considered as a whole;" (ii) "each part of the contract should be given effect," and (iii) "no one phrase, sentence or section of a contract should be isolated from its setting and considered apart from the other provisions." Brief of Creditor [ECF No. 73] at 2; Association Brief [ECF No. 74] at 3 ("[t]he Court must examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none are rendered meaningless.").

*DeWitt Cnty. Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex. 1999) (citations omitted). Rather, a contract is ambiguous only if it is subject to two or more reasonable interpretations after applying the pertinent canons of construction. *Webster*, 128 S.W.3d at 229 (citation omitted). If the contract is ambiguous, courts may consider parol evidence to ascertain the parties' intent. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008).

With this precedent in mind, the Court has carefully analyzed all of the provisions of the Bylaws and the Covenants; however, three provisions of the Bylaws and one provision of the Covenants are particularly relevant to the Courts' analysis. Article VIII, § 2(h) of the Bylaws is the starting point. It provides, in pertinent part, that:

> It shall be the duty of the Board of Directors:
>
> \*\*\*
>
> (h) to maintain and operate the underground water sprinkler system on each Lot (referred to in the Declaration and herein as the ("System")) and to provide exterior maintenance for each Lot, which exterior maintenance shall include exterior painting, repairing[,] replacing and caring for roofs, fences, gutters, downspouts, exterior surfaces, trees, shrubs, grass, walks and other exterior improvements, but such exterior maintenance shall not include maintenance of glass, glass surfaces, screens and screen doors, exterior doors and window fixtures and hardware and the interior of any Patio Area and the interior of any house. In the event that the need for any maintenance or repair is caused through the willful or negligent act or omission of the Owner, his family, guests, invitees, or tenants or his tenants' family, guests, or invitees, the cost of such maintenance or repairs shall be added to and become a part of the assessment to which such Lot is subject.

By-Laws [Association Ex. 8] Art. VII, § 2(h).

Thus, the question becomes are repairs to the foundation of Dudek's townhome "exterior maintenance for each Lot." "Lot" is a defined term in the Bylaws and "shall mean and refer to any plot of land shown upon any recorded subdivision map of the Properties with the exception of the Recreation and Common Areas." *Id.* at Art. II, § 4. Obviously, examples of what the phrase "exterior maintenance for each Lot" includes and does not include are expressly stated, but

MEMORANDUM OPINION 10

foundation repairs are not mentioned as being either included or excluded. While the Court would not normally consider repairs to a home's foundation as "exterior maintenance for each Lot," it would not have thought that "repairing, replacing and caring for roofs…gutters, downspouts" constituted exterior maintenance for each Lot either.[9] Thus, this provision, standing alone, is not clear and the Court will look for further guidance in the relevant documents.

The second relevant provision is Article XII, § 2 entitled "Purposes of Assessments." It provides that:

> [t]he assessments levied by the Association shall be used exclusively for promoting the recreation, health, safety and welfare of the residents in the Properties and for improving and maintaining the Properties excluding the interiors, but including the exterior of Owners' dwelling on the Lots and the yard portion of the Lots outside any Patio Area, the System installed on each Lot and services and facilities devoted to these purpose and related to the use and enjoyment of the Lots and Recreation and Common areas.

*Id.* Art. XII, § 2. At the Hearing, Garrett testified that Members of the Association pay monthly dues to the Association of $225.75 each, for an aggregate monthly total of approximately $9,000-$10,000, given that some Members do not pay their dues on time and/or are behind in their payments. As Article XII, § 2 states, assessments may be used to maintain the Properties (defined in the Covenants as "the Lots and the Recreation and Common Areas…") "including the exterior of Owners' dwelling on the Lots…." So, the question becomes, is Dudek's foundation part of the exterior of her "dwelling?" And, once again, the Court would not normally consider the foundation to be part of the exterior of Dudek's dwelling, thinking that the exterior of her home would be the brick or siding covered walls, along with the roof.

Finally, Article XII, § 4 entitled "Special Assessments" provides that:

> In addition to the annual assessments and charges authorized above, the Association may levy in any assessment year a special assessment applicable to that year only

---

[9] These potential differences may be accounted for by the unique nature of townhome living. The building that includes Dudek's townhome also includes five other townhomes, each of which share a common roof and foundation.

MEMORANDUM OPINION 11

> for the purpose of, in whole or in part a deficit in the budget, the cost of any construction or reconstruction, unexpected repair or replacement of a described capital improvement upon the Recreation and Common Areas, including the necessary fixtures and personal property related thereto….

*Id.* Art. XII § 4. So, this provision would permit a Special Assessment if there were a deficit in the annual budget of the Association, but sheds no real light on what exterior maintenance of a Lot includes or whether the foundation is part of the exterior of Dudek's dwelling.

So, while the Bylaws are not particularly clear, the Court would likely conclude that repairing an Owner's foundation was not the obligation of the Association. However, a provision of the Covenants adds to the uncertainty regarding the correct interpretation of the governing documents. Specifically, Article IX, § 3 of the Covenants entitled "Responsibility of Owners" provides:

> Each Owner shall be responsible for the reconstruction, repair or replacement of the interior of his main residential structure, including without limitation the floor coverings, wall coverings, window shades, draperies, interior walls, furniture, furnishings, decorative light fixtures and all appliances located therein irrespective of whether such appliances are "built in."

Covenants [Association Ex. 9] Art. IX, § 3. And, while it clearly provides that each owner shall be responsible for the "repair … of the interior of his main residential structure," the Court would not normally consider the foundation to be part of the interior of Dudek's "main residential structure" like floor coverings, wall coverings, window shades, draperies, interior walls, etc.

But, that leaves us where we started. Who is responsible for repairs to the foundation of Owners' townhomes? Someone is responsible for them and there are only two possibilities—*i.e.*, the Association or the Owners. Given that the provisions of the Bylaws and Covenants are arguably inconsistent with each other, the Court concludes that the governing documents are ambiguous. To resolve this ambiguity, the Court can no longer rely solely on the language of the governing documents to determine the parties' intent, and must look to extrinsic or parol evidence.

MEMORANDUM OPINION                                                                                              12

*Carpenters Amended and Restated Health Ben. Fund v. Holleman Const. Co. Inc.*, 751 F.2d 763, 766 (5th Cir. 1985). If a contract is ambiguous, as here, then "[p]arol evidence—such as the parties' course of performance—may be used to ascertain the intent of the parties...." *See Addicks Servs., Inc. v. GGP–Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir.2010).[10]

From the Court's perspective, the Association has introduced evidence "equal in probative force" to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the Dudek Claim's legal sufficiency. It did this by (i) placing the Bylaws and Covenants into evidence, and (ii) adducing the testimony of Capote (the owner of The Foundation Company) who testified that in his opinion the foundation is not an exterior surface. The Association's counsel also made legal arguments regarding the effect of the governing documents.

But the Association went even further, it offered the testimony of Garrett, who testified that since she had been President of the Association's Board of Directors, the Association had consistently taken the position that repairing foundations was each Owner's responsibility, not the responsibility of the Association. Moreover, Garrett credibly testified that given the low monthly dues, it was unrealistic of Owners to think that the Association was responsible for foundation repairs. Garrett also testified that the Association had consulted counsel and was advised that foundation repairs were not its responsibility under the governing documents. *See, e.g.*, Association Ex 26. Finally, Garrett testified that when the foundation underlying her townhome (and the townhomes of other Owners in her building that share the common foundation) needed repair, those Owners went together and had their common foundation repaired at their expense,

---

[10] "Course of performance" refers to a sequence of conduct between the parties to a particular transaction that takes place during the performance of the contract at issue, meaning that a course of performance occurs after contract formation. See TEX. BUS. & COM. CODE ANN. § 1.303(a).

not the Association's expense. This testimony is admissible parol evidence of the course of performance of the Association and other Owners consistent with the Association's view regarding the proper interpretation of the governing documents—*i.e.*, that the Association is not responsible to repair the foundation of Dudek's townhome.

Thus, the ultimate burden of persuasion has shifted back to Dudek to prove her claim by a preponderance of the credible evidence. And, given her failure to file a witness or exhibit list or come to the Hearing with any witnesses other than Nacol (who only testified to the reasonableness of his attorney's fees and expenses), there is simply no evidence in the record establishing that, at the time the Bylaws and Covenants were executed, the parties intended that foundation repair was the Association's responsibility. Without evidence that the Association is contractually obligated to repair the foundations of individual Owner's townhomes, the Dudek Claim fails.

Moreover, Dudek put on no evidence regarding the amount of her alleged damages. Thus, even if the Association is responsible for the repair of Dudek's foundation, which Dudek has failed to prove, the Dudek Claim must be disallowed for her failure to prove up the cost to repair her foundation.[11]

---

[11] Ironically, the Association provided Dudek some assistance in this regard when it admitted into evidence a $5,691.00 estimate of repair costs to Dudek's foundation, which was the estimate provided to the Association by The Foundation Company. Association Ex 21, repair estimate for unit 511. Thus, if an appellate court concludes that the Association has breached the governing documents by failing to repair Dudek's foundation, the maximum claim allowable here is $5,691, plus her reasonable attorneys' fees and expenses, which the Court finds to total $12,414.50 ($9,000.00 in fees and $3,414.50 of expenses). While those amounts represent a significant reduction of the fees and expenses requested by the Nacol Law Firm prior to the Association's bankruptcy filing, the Court believes the amounts requested were unreasonably high based on the evidentiary record before it. Moreover, the Court must disallow fees and expenses incurred post-petition, as Dudek is, at most, an unsecured creditor and the general rule in bankruptcy is that unsecured creditors cannot recover postpetition attorneys' fees and expenses. *See In re Pride Co., L.P.,* 285 B.R. 366 (Bankr. N.D. Tex. 2002) (citing cases). Although the Association argues that Dudek is not entitled to attorneys' fees under Texas law because she failed to properly present her claim in accordance with Texas Civil Practice and Remedies Code § 38.002, the Court disagrees. As clearly reflected in the letter from the Association's counsel to Dudek's counsel dated July 22, 2015 [Association Ex. 26], Dudek demanded that the Association pay to repair her foundation, and the Association refused. The fact that Dudek's initial demand itself is not in the record does not trouble the Court because the statute does not require a particular form of presentment. The only requirements are that: (i) the claimant must be represented by an attorney, (ii) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party, and (iii) payment for the just amount owed must not have been

MEMORANDUM OPINION 14

For these reasons, the Court concludes that the Association's objection must be sustained and the Dudek Claim disallowed.  As noted previously, the Nacol Firm Claim was withdrawn on the record on March 24, 2017 as a duplicate, derivative claim of the Dudek Claim.

The Court directs counsel for the Association to upload an Order disallowing the Dudek Claim within seven days of the entry of this Memorandum Opinion on the Court's docket.

# # # **END OF MEMORANDUM OPINION** # # #

---

tendered before the expiration of the 30th day after the claim is presented.  *See Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 386-87 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing cases).  Association Ex. 26 clearly shows that Dudek met each of these requirements.